IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 07-cv-02422-MSK-BNB

JOSEPH BRADSHAW,

      Plaintiff,

v.

D.R. [sic] NAFZIGER,
P.A. OSAGIE, and
DR. AMIRKHAN,

      Defendants.

_____

**OPINION AND ORDER GRANTING, IN PART, MOTION FOR RECONSIDERATION, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DENYING MOTION FOR LEAVE TO AMEND**

_____

      **THIS MATTER** comes before the Court pursuant to the Defendants' Second Motion for Summary Judgment[1] (**# 282**), Mr. Bradshaw's response (**# 291, 292**), and the Defendants' reply (**# 294**); Mr. Bradshaw's Motion to Correct Dual Filing Fee Fundamental Unfairness (**# 293**); the Plaintiffs' Motion for Reconsideration (**# 295**) of the Court's September 7, 2010 Opinion (**#280**), the Defendants' response (**# 297**), and the Plaintiffs' reply (**# 305**); the Plaintiffs' Motion For Certification of Judgments Pursuant to Fed. R. Civ. P. 54(b) (**# 300**), and the Defendants' response (**# 302**); the Plaintiffs' Objections (**# 303**) to the November 1, 2010 Recommendation (**#298**) of the Magistrate Judge that the Plaintiffs' Motion to Amend the Complaint (**# 272**) be

_____

[1]This motion effectively renders moot the Defendants' prior Motion for Summary Judgment (**# 250**).

denied, and the Defendants' response **(# 304)**; and Mr. Bradshaw's Motion for Leave to File

Affidavit and Medical Records **(# 306)**, the Defendants' response **(# 309)**, and Mr. Bradshaw's

reply **(# 210)**; and Mr. Bradshaw's second Motion for Leave to File Supplemental Records

**(#312)**, which the Court construes as a request to supplement his summary judgment response.

## FACTS

The Court assumes familiarity with the proceedings to date and simply summarizes the

general background of this case, elaborating as necessary as part of its analysis. Mr. Bradshaw

and Mr. Tuttamore, both inmates in the custody of the Federal Bureau of Prisons ("BOP"),

commenced this action alleging two types of *Bivens* claims. Both Plaintiffs alleged that the BOP

had improperly forced them to participate in the Inmate Financial Responsibility Program

("IFRP"), deducting sums from their inmate trust accounts in order to satisfy court-ordered

restitution obligations that had not yet matured.[2] Separately, Mr. Bradshaw also asserted claims

sounding in deliberate indifference of BOP staff to his medical needs.

In a September 7, 2010 Opinion and Order **(# 280)**, this Court, among other things: (i)

consolidated this case with a separate proceeding that Mr. Bradshaw had commenced to address

his medical claims; (ii) granted summary judgment to the Defendants on both inmates' claims

that BOP officials deprived them of property by making unauthorized withdrawals from the trust

---

[2]Both Plaintiff insist that, because their sentencing court did not establish a specific restitution payment schedule, their obligation to begin making restitution payments has not yet matured. They point out that, in the 10th Circuit, sentencing courts may not delegate the task of setting a restitution schedule to the BOP. *U.S. v. Overholt*, 307 F.3d 1231, 1254-56 (10th Cir. 2002). Thus, they contend, they have no mature financial obligations, and therefore, the BOP's application of the IFRP to them is unwarranted.

The Court does not understand the Plaintiffs to contend that, assuming their restitution obligations <u>were</u> mature, the BOP could properly subject them to the requirements of the IFRP.

accounts through the IFRP, on the grounds that *Bivens* does not provide a remedy for such claims; (iii) to the extent the IFRP claims sought money damages against the Defendants for improperly placing the Plaintiffs on IFRP "refusal" status and withdrawing privileges from them, found the Defendants were entitled to qualified immunity insofar as the Plaintiffs' rights not to be put on such status was not "clearly established" at the time; and (iv) found that claims by the Plaintiffs for prospective injunctive relief against being placed on "refusal" status in the future were premature, as neither Plaintiff had, as of that date, refused to participate further in the IFRP. Thus, the Court entered a partial judgment pursuant to Fed. R. Civ. P. 54(b) on behalf of all Defendants relating to the IFRP claims, and directed the Defendants on Mr. Bradshaw's medical claims re-file a motion for summary judgment on those claims (the substantive motion had previously been filed only in the separate proceeding that was later consolidated with this case).

The pending motions can be broken down into the following categories: (i) requests by both Plaintiffs for reconsideration of that portion of the Court's Opinion that found no cognizable basis for the IFRP claims; (ii) a motion for summary judgment by the remaining Defendants on Mr. Bradshaw's medical claims; (iii) a request by Mr. Bradshaw to amend his complaint; and (iv) collateral issues.  The Court will address each of these in turn.

## ANALYSIS

### A.  Standard of review

In considering the Plaintiffs' filings, the Court is mindful of their *pro se* status, and accordingly, reads their pleadings liberally.  *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972). However, such liberal construction is intended merely to overlook technical formatting errors and other defects in the Plaintiffs' use of legal terminology and proper English.  *Hall v. Bellmon,*

935 F.2d 1106, 1110 (10th Cir. 1991).  *Pro se* status does not relieve the Plaintiffs of the duty to

comply with the various rules and procedures governing litigants and counsel or the

requirements of the substantive law, and in these regards, the Court will treat the Plaintiffs

according to the same standard as counsel licensed to practice law before the bar of this Court.

*See McNeil v. U.S.*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455

(10th Cir. 1994).

### B.  Motion for Reconsideration

Both Plaintiffs move for reconsideration, pursuant to Fed. R. Civ. P. 60(b), of certain

portions of the Court's September 7, 2010 Opinion.  The Court found that the Plaintiffs' claims

for damages against the individual Defendants were barred by qualified immunity as a result of

there being no "clearly established" law creating individual liability for improper application of

the IFRP, and that because both Plaintiffs were voluntarily participating in the IFRP, their

request for injunctive relief against being placed in IFRP "refusal" status in the future was

"premature."  Both Plaintiffs seek reconsideration of both of these findings, but, as explained

below, the Court need only address the latter issue.

Mr. Bradshaw contends that the Court mistakenly found that "at present . . . [neither]

Plaintiff has expressly advised the BOP that he wishes to withdraw his consent to participate in

the IFRP program."  He points out that an affidavit submitted as part of the briefing of the earlier

motion establishes that "[o]n June 28, 2010, [Mr.] Bradshaw voluntarily refused to renew [his]

January 2007 IFRP contract," and that as a result, he "will be placed in IFRP 'refuse' status at

the beginning of the next IFRP payment cycle (September 2010)."  *Docket # 249-2.*  As a result,

the Court agrees with Mr. Bradshaw that its observation in the September 7, 2010 Opinion was

4

inconsistent with the evidence in the record.

Mr. Tuttamore does not allege that the Court overlooked any particular facts – for the entirety of this litigation, Mr. Tuttamore has been treated as "exempt" from IFRP obligations, as his indebtedness far exceeds his earnings – but argues that he may someday lose his exempt status and may have to choose between submitting to (what he says is) coercion to participate or the consequences of refusing, and thus, the Court should address the injunctive relief prong under, among other things, the doctrine that a claim is not rendered moot (or unripe) by voluntary cessation of unlawful conduct by the defendant where the defendant could later elect to resume it. *See e.g. Rio Grande Silvery Minnow v. Bureau of Land Management*, 601 F.3d 1096, 1115 (10th Cir. 2010).

The Court has grave doubts that either Plaintiff has standing to pursue a request for injunctive relief.[3]  But in the interests of conclusively addressing the claims herein, the Court assumes that both Plaintiffs have the requisite standing to pursue a request for injunctive relief. Nevertheless, as the Court's September 7, 2010 Opinion makes clear, it is difficult to ascertain the contours of a cognizable claim for relief (including injunctive relief) that could be stated. Crystalizing the issue (in the light most favorable to the Plaintiffs), the question in this case is

---

[3]The record is ambiguous as to whether Mr. Bradshaw's restitution obligation is presently mature, such that the BOP can properly revoke privileges for his refusal to work towards paying it off through the IFRP.   In 2007, the BOP apparently sought clarification from Mr. Bradshaw's sentencing court about the court's intended schedule for Mr. Bradshaw's restitution.  At some point thereafter, the BOP concluded – on evidence that is not before the Court – that Mr. Bradshaw had an extant obligation to participate in the IFRP.  Thus, it is not clear to the Court that, as Mr. Bradshaw contends, his restitution obligation is not yet ripe.

The Court has doubts as to Mr. Tuttamore's standing because Mr. Tuttamore's speculation that he might some day come off "exempt" status and, at that time, may choose to refuse to participate in the IFRP is simply that – speculation.

whether a constitutional claim can be stated where the BOP mistakenly deems an inmate's

financial obligations to be subject to the IFRP, and then revokes privileges of the inmate who

refuses to participate.

The Court's initial inclination is to examine the claim as one for deprivation of due

process, either substantive or procedural, in violation of the 4th Amendment.   But due process

claims require, as an essential element, a deprivation of liberty or property by the Government.

*U.S. Const.*, Am. 5 ("No person shall . . . be deprived of . . . liberty, or property without due

process of law"); *Swarthout v. Cooke*, 131 S.Ct. 859, 861 (2011) ("As for the Due Process

Clause, standard analysis under that provision proceeds in two steps: We first ask whether there

exists a liberty or property interest of which a person has been deprived, and if so we ask

whether the procedures followed by the State were constitutionally sufficient") (emphasis

added); *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("those who seek to invoke [the due

process clause's] procedural protection must establish that one of these interests is at stake").

Here, there is no cognizable claim that inmates on refusal status are being deprived of property;

"refusal" status denotes an inmate who refuses to surrender "property" (funds) from their trust

accounts.  Thus, the question is whether the BOP's improperly placing an inmate on "refusal"

status and withdrawing privileges from him somehow constitutes a deprivation of a liberty

interest.

Liberty interests arise either "from the Constitution itself, by reason of guarantees

implicit in the word 'liberty'," or they "may arise from an expectation or interest created by state

laws or policies."  *Wilkinson*, 545 U.S. at 221.  Courts have been extremely reluctant to derive

liberty interests wholesale from the Constitution where the interest related to the particular

conditions of an inmate's confinement, noting that the fact of an inmate's conviction gives rise to a "range of custody" options that the state might lawfully impose. *Id.*, *citing Meachum v. Fano*, 427 U.S. 215, 225 (1976). At one point in time, the courts recognized liberty interests in conditions of prison confinement created by state (or, here, federal) policies or regulations, but that approach was abandoned by the Supreme Court in *Sandin v. Connor*, 515 U.S. 472, 483-84 (1995), and the current standard requires an inmate claiming a liberty interest in conditions of confinement to show that the challenged conditions "impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."[4]  *Id.*; *Wilkinson*, 545 U.S. at 222-23 ("the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves in relation to the ordinary incidents of prison life"). In short, to show that the privileges that are revoked from inmates on refusal status give rise, individually or collectively, to a liberty interest, the Plaintiffs must show that the withdrawal of those privileges result in conditions of confinement that are "atypical and significant" compared to ordinary prison life.

As the Court explained in its prior Order, the overwhelming weight of authority establishes that the kinds privileges that are withheld from inmates refusing to participate in the

---

[4]*Sandin* thus disposes of any argument that the IFRP's language defining matured "financial obligations" warranting inmate participation, *see e.g.* 28 C.F.R. § 545.11(a)(1-5) (listing obligations giving rise to IFRP participation), itself creates a separate liberty interest in not having not-yet-matured financial obligations – such as restitution obligations for which the sentencing court did not establish a repayment schedule – included by the BOP in an IFRP repayment plan.  *Sandin* makes clear that the focus of inquiry into the existence of a liberty interest in the prison context is not the rights that might arguably created by language in a regulation, but rather, the conditions of confinement that result from the application of the regulation.

IFRP – loss of opportunities to earn bonus pay, ineligibility for outside work details, commissary restrictions, low priority for cell assignments, *see* 28 C.F.R. § 545.11(d), and even, taking the light in the evidence most favorable to the Plaintiffs here, loss of access to the ADX "step-down" program and the concomitant chance to obtain a transfer to a less-restrictive facility  – are not of sufficiently serious, individually or collectively, to give rise to a protected liberty interest that requires the protection of due process:

> the privileges that are withdrawn from inmates on IFRP refusal status are fairly limited and benign, and even assuming that the loss of access to the "step down" program is among those things withheld from ADX inmates, the 10th Circuit has found that removal of an inmate already <u>in</u> the "step down" program to a more restrictive unit does not give rise to a liberty interest. *Muhammad v. Hood*, 100 Fed.Appx. 782, 783 (10th Cir. 2004) (unpublished); *see also Duronio v. Gonzales*, 293 Fed.Appx. 155, 157 (3d Cir. 2008) (unpublished) (privileges revoked because of IFRP refusal status do not give rise to liberty interest).  Indeed, the 10th Circuit has recognized as much.  *Davis v. Wiley*, 260 Fed.Appx. 66, 68-69 (10th Cir. 2008) (unpublished) (in *habeas* case brought under 28 U.S.C. § 2241, affirming constitutionality of IFRP and noting that "the benefits that can be denied [as a result of refusal status] are not constitutionally guaranteed" and that "mere inducements – such as the BOP's threat to alter Davis' place of confinement – without more, do not infringe on a prisoner's protected liberty interest").

*Docket* # 280 at 19-20[5]; *see also U.S. v. Lemoine*, 546 F.3d 1042, 1045 (9th Cir. 2008) ("the consequences the BOP imposes on inmates who refuse to participate in the IFRP . . . are not so

---

[5]The Plaintiffs argue that *Muhammad* is not persuasive because it predates *Wilkinson* and, the Plaintiffs contend, the conditions at ADX have changed since it was decided.  As recently as November 2010, courts have extensively analyzed the current conditions of confinement in general population units at ADX and found them not to amount to "atypical and significant hardships" under *Wilkinson*.  *See Saleh v. Federal Bureau of Prisons,* 2010 WL 5464295 (D. Colo. Nov. 23, 2010).  Thus, this Court cannot conclude that any greater liberty interest in participation in the step-down program has arisen.

severe as to impose an 'atypical and significant hardship' and therefore do not infringe on any constitutionally-protected liberty interest").  Because placement on "refusal" status does not implicate any constitutionally-protected liberty interest, the Plaintiffs here cannot establish a due process claim sufficient to permit this Court to grant injunctive relief.[6]

The only other constitutional provision that might even arguably give rise to a claim for relief in this set of circumstances is the 8th Amendment, in the sense that the withdrawal of privileges for inmates on "refusal" status amounts to "cruel and unusual punishment."  Again, the Court previously considered and rejected this argument in its September 7, 2010 Opinion, *see Docket* # 280 at 19, and nothing in the Plaintiffs' motion for reconsideration presents a persuasive argument to the contrary.

The Court has also considered whether the Plaintiffs' claims could be cognizable as a *habeas corpus* petition, attacking the execution of their sentences pursuant to 28 U.S.C. § 2241. This was precisely the tack chosen by the inmate in *Davis v. Wiley*, 260 Fed.Appx. 66 (10th Cir. 2008) (unpublished).  There, the court resolved the inmate's *Overholt* contention – that his sentencing court erred in not including a restitution schedule as part of the judgment – by finding that such a claim had to be directed to the sentencing court under 28 U.S.C. § 2255.  *Id.* at 68. Thus, to the extent that the Plaintiffs here contend that their sentences were imposed in violation of *Overholt*, these claims must be brought via § 2255 petitions in Massachusetts (for Mr.

_____

[6]Although it may seem odd to, on the one hand, assume that the BOP has incorrectly found that the Plaintiffs have mature restitution obligations such as to warrant IFRP participation, yet at the same time find that the Plaintiffs have no constitutional ability to compel the BOP to correct that error, this is simply an acknowledgment that the due process clause is inherently limited in its ability to address arbitrary-but-legally-inconsequential governmental action.

9

Bradshaw) and Ohio (for Mr. Tuttamore), not in a *Bivens* claim here.[7]   The *Davis* court also

addressed what appeared to be a separate challenge by the inmate to the BOP's application of the

IFRP to him, which the Court found was properly raised via a § 2241 petition.  *Id.* at n. 2.

Nevertheless, the court found that the BOP was "within its constitutional authority to establish

and enforce payment amounts Davis must make towards the court-ordered special assessment

and restitution," notwithstanding his apparent contention that the sentencing court had

improperly deferred the setting of a restitution schedule to the BOP.  *Id.* at 69.  Because *Davis* is

effectively indistinguishable on its facts, this Court has some doubt that a § 2241 petition by the

Plaintiffs here could result in any different outcome.[8]

      Simply put, the Court finds that, even if the Plaintiffs are correct that they have been

--------------------------------

     [7]Admittedly, both the 1st Circuit, encompassing Massachusetts, and the 6th Circuit, encompassing Ohio, take the contrary position to *Overholt*, allowing sentencing courts to defer to the BOP to set restitution schedules. *Bramson v. Winn,* 136 Fed.Appx. 380, 381 (1st Cir. 2005) (unpublished); *Wienberger v. U.S.*, 268 F.3d 346, 360 (6th Cir. 2001).   Thus, a § 2255 petition to these courts, predicated on a contention that the failure of the sentencing court to set a restitution schedule warrants relief, would likely be unavailing.

     This "Catch-22" situation simply underscores the importance of confining the reach of *Overholt* to its clear holding, which merely requires <u>sentencing courts in the 10th Circuit</u> to expressly set restitution schedules.  Extending *Overholt* to limit the ability of the BOP to apply the IFRP to prisoners who were sentenced in deferral jurisdictions but housed in prisons in the 10th Circuit may raise more problems than it solves.  In this sense, although the 10th Circuit correctly intuited that "it seems problematic to conclude that the BOP may assume for itself a responsibility that the district court is not permitted to delegate it," *Bradshaw v. Lappin*, 320 Fed.Appx. 846, 849 (10th Cir. 2009), it is essential to recognize the equally problematic fact that, at least in some jurisdictions, the sentencing court <u>is</u> permitted to make such a delegation, and inmates subject to sentences from those jurisdictions may eventually be housed in prisons in the 10th Circuit.

     [8]Admittedly, unpublished decisions of the 10th Circuit are not precedential pursuant to 10th Cir. R. 32.1(a), but they may be relied upon for their persuasive value.  Here, the *Davis* opinion would be on all fours, factually and procedurally, with any § 2241 petition the Plaintiffs could file, and thus, the reasoning and outcome of *Davis* persuasively predicts the outcome of any similar effort by the Plaintiffs.

prematurely asked to participate in the IFRP and have been (or will be) improperly placed on "refusal" status, the Court cannot ascertain any constitutional claim that they could bring to remedy that situation. As a result, even upon reconsideration based on a more correct understanding of Mr. Bradshaw's position, the Court nevertheless finds that it properly granted summary judgment to the Defendants on all aspects of the Plaintiffs' IFRP-based claims, including a claim for injunctive relief.[9]

### C. Mr. Bradshaw's medical claims

The remaining Defendants seek summary judgment on Mr. Bradshaw's claims of deliberate indifference to his medical needs in violation of the 8th Amendment to the U.S. Constitution.

Mr. Bradshaw raises two distinct claims of deliberate indifference: (i) he contends that he suffers from heart disease and presented symptoms of a heart attack to Defendant Nafziger, but that Dr. Nafziger failed to direct appropriate treatment for that condition; and (ii) Defendants Osagie and Amirkahn, along with Dr. Nafziger, failed to afford him treatment in conformance with BOP policies governing inmates with hepatitis.

The 8th Amendment to the United States Constitution prohibits "cruel and unusual punishment." Among the punishments prohibited by the 8th Amendment are those amounting to "wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). Where a prison

---

[9]This conclusion also suffices to dispose of the Plaintiffs' contention that the Court improperly granted summary judgment to the individual Defendants on the grounds of qualified immunity. Because the Court finds that no constitutional claim lies for improper application of the IFRP, the individual Defendants would have no liability to the Plaintiffs whether the doctrine of qualified immunity applied or not. The Court has also considered the remaining contentions in the Plaintiffs' motion, and finds them to be without merit.

official exposes an inmate to unnecessary suffering by denying medical care, the 8th Amendment may be violated. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).  However, the Constitution is only implicated in situations in which prison officials act purposefully to impose unnecessary pain on an inmate; "inadvertent" denials of care or negligent diagnosis or treatment does not rise to the level of an 8th Amendment violation.  *Id.* at 106

Thus, to adequately plead a constitutional claim for deliberate indifference to medical needs, an inmate must allege: (i) that he suffered from a serious medical need – that is, one that has been diagnosed by a medical provider as requiring treatment or one which even a lay person would easily recognize as requiring medical attention; and (ii) the Defendant was subjectively aware of that need and that failing to treat it would pose an excessive risk to the inmate's health or safety, but nevertheless elected to delay or deny treatment for it.  *See e.g. Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  The subjective component requires an examination into the defendant's actual state of mind.  To satisfy this element, the inmate must plead facts that show that the defendant both "actually knew of" and "deliberately disregarded" the fact that the inmate was suffering from a serious medical need.  *Boles v. Dansdill,* 361 Fed.Appx. 15, 18 (10th Cir. 2010) (unpublished), *citing Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980).  It is not sufficient for the inmate to plead facts showing a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives.  *Ramos*, *id.* at 575.  Rather, the inmate must show that a defendant "prevented [him] from receiving recommended treatment" or that the defendant "denied [him] access to medical personnel capable of evaluating the need for treatment."  *Id.*

Turning first to Mr. Bradshaw's contention that Dr. Nafziger was deliberately indifferent

to Mr. Bradshaw's heart condition, this claim seems to relate primarily to an August 2007 incident in which Mr. Bradshaw – who has a history of tachycardia and was on medication to manage that condition – was seen by Dr. Nafziger for a personal consultation.  According to Mr. Bradshaw, at that time, Mr. Bradshaw informed Dr. Nafziger that he "had had chest pains for over ½ hour, felt weak, dizzy, and that it felt like I was having a heart attack that day."  Mr. Bradshaw told Dr. Nafziger that he had felt these symptoms over the past two weeks, and had to "commonly tailor my work-out according to these symptoms," regardless of whether he had taken his tachycardia medication or not.   Mr. Bradshaw asserts that "Dr. Nafziger admitted the symptoms presented to him were an indication of a heart attack/heart disease symptoms," and that Dr. Nafziger "sent me back to my cell . . . saying he would order a cardiologist evaluation, because the proper course of assessment was a catheter study."  Apparently, no such evaluation was ordered.  Mr. Bradshaw's affidavit in opposition to the Defendants' motion does not recite any particular consequences from this event.

Dr. Nafziger's version of events is quite different.  He contends simply that Mr. Bradshaw complained of tachycardia and chest pain when he performed heavy exercise and when he missed his medication doses.  Dr. Nafzinger states that his notes do not reflect his alleged recommendation of a cardiac consultation, and that it was his practice to note such recommendations when they are given.  Dr. Nafziger's contemporaneous notes from the consultation make no apparent mention of "heart disease," "heart attack," "catheter study," or a cardiologist consultation.  The notes do include an observation, under the heading "Physical Exmination, Gen[eral]," the notation "NAD," which is customarily used by doctors to reflect that the patient is in "no apparent distress."

Although Mr. Bradshaw's version of events conflicts in several respects with Dr. Nafziger's contemporaneous notes from the consultation, the Court is not free to attempt to resolve these credibility disputes on summary judgment.  The Court need not credit affidavits that are simply efforts to create a "sham fact issue," but generally, such a situation only arises where the affidavit is somehow inconsistent with the witness' prior deposition testimony.  *See generally Law Co., Inc. v. Mohawk Const. and Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009). Here, although Dr. Nafziger disputes Mr. Bradshaw's version of events, he has not provided the Court with previous, conflicting deposition testimony from Mr. Bradshaw, nor any other prior evidence of testimonial significance from which the Court could conclude that Mr. Bradshaw's current allegations are inconsistent with his prior position.  Under these circumstances, the Court conducts the deliberate indifference analysis on the strength of Mr. Bradshaw's version of events.

Mr. Bradshaw's allegations satisfy the objective component of the deliberate indifference analysis, insofar as he contends that Dr. Nafziger specifically diagnosed him as having "heart attack/heart disease symptoms," that warranted medical treatment, either in the form of a "catheter study" or a cardiologist's evaluation.  Similarly, Mr. Bradshaw's contentions are sufficient to satisfy the subjective element – that Dr. Nafziger recognized the need for additional medical care for Mr. Bradshaw but failed to ensure that it was provided.  According to Mr. Bradshaw, Dr. Nafziger noted that the proper course of action in response to what he had allegedly diagnosed was a cardiologist's consultation and a catheter study but, by all appearances, no such consultation or study was ordered by Dr. Nafziger.

However, the evidence is less significant with regard to a third element of a deliberate

14

indifference claim: where the inmate's complaint is one that there was a delay in providing

necessary medical care, liability under the 8th Amendment arises only where the inmate suffers

"substantial harm" as a result of the delay.[10]  *Boles v. Dansdill*, 361 Fed.Appx. 15, 19 (three-

month break in providing snacks for hypoglycemic inmate did not violate 8th Amendment where

he eventually began receiving snacks again and no evidence indicated that he suffered any harm

in intervening period), *citing Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000).

Usually, an inmate shows "substantial harm" by demonstrating either that the delayed treatment

caused a worsening of the inmate's condition or cause the inmate to suffer unnecessary pain.

*Mata v. Saiz*, 427 F.3d 745, 755 (10th Cir. 2005).

Here, Mr. Bradshaw's affidavit makes no assertion that his cardiac condition was

worsened by a delay in obtaining the treatment Dr. Nafziger directed, nor is there clear evidence

that Mr. Bradshaw suffered significant pain that could have been avoided had Dr. Nafziger

arranged the cardiac consultation he allegedly anticipated.  Unlike the inmates in cases like *Mata*

and *Sealock*, who describe intense, debilitating chest pains, Mr. Bradshaw does not quantify the

chest pains he was suffering at the time, other than to note that they lasted ½ hour on the day he

was later seen by Dr. Nafziger and that they had previously caused him to change his workout.

Dr. Nafziger's notes from the consultation do not quantify Mr. Bradshaw's pain either, but note

Dr. Nafzinger's understanding that Mr. Bradshaw was currently experiencing only "dull, achy

muscular pain."  Most notably, Mr. Bradshaw's affidavit does not state that he continued to

---

[10]Some cases treat a showing of substantial harm from delayed treatment as part of the
subjective component.  *See Mata v. Saiz*, 427 F.3d 745, 755 (10th Cir. 2005).  Logically, if Dr.
Nafziger's subjectively believed that Mr. Bradshaw could safely experience some delay before
the catheter study or cardiologist consultation were provided, he cannot have subjectively
disregarded a risk of immediate harm that Mr. Bradshaw might suffer.

suffer any severe pain after having seen Dr. Nafziger in August 2007, or, at the very least, state that he continued to suffer severe pain beyond the time that a cardiac consultation and catheter study, if promptly ordered, would have helped abate that pain.  Under these circumstances, Mr. Bradshaw has failed to come forward with evidence that Dr. Nafziger's delay in treating his heart condition caused him "substantial harm," and thus, Dr. Nafzinger is entitled to summary judgment on this claim.

Mr. Bradshaw's remaining claim concerns the treatment he received for his hepatitis condition.  Mr. Brashaw has had hepatitis since 1982.  Mr. Bradshaw contends that "guidelines" state that a liver biopsy is "the best means of staging liver disease," compared to the inaccuracy of blood testing.  In 2006, Mr. Bradshaw filed a prison grievance requesting a liver biopsy.  In January 2007, the BOP responded to his grievance stating that, upon consultation with Dr. Nafziger, a biopsy would be ordered, although the prison's medical Utilization Review Committee would have to determine whether the biopsy would ultimately be provided.

Mr. Bradshaw contends that Dr. Nafziger "wrote the biopsy order as a ruse to make it appear I'd be biopsied."  The Utilization Review Committee ultimately denied the request for a biopsy, noting that a "genotype determination" – an identification of which particular strain of hepatitis Mr. Bradshaw had – was a precondition to such a biopsy, and the record did not indicate that Mr. Bradshaw had been genotyped  Mr. Bradshaw contends that Dr. Nafziger "intentionally presented the [Committee] with the biopsy order without genotyping, knowing they would deny it."[11]  Mr. Bradshaw argues that Dr. Nafziger's subsequent attempts to treat him based on results of his blood tests demonstrate deliberate indifference because medical protocols

---

[11]Mr. Bradshaw eventually received a liver biopsy in December 2009.

16

indicate that such blood tests are unreliable indicators of disease progression.

Dr. Nafzinger's affidavit is not necessarily inconsistent with the factual components discussed above.  He contends that, beginning in March 2007, he consulted with Mr. Bradshaw about his hepatitis.  Dr. Nafziger claims that he discussed the BOP's "prescription drug protocols" for the condition, and would recommend a biopsy if Mr. Bradshaw's blood tests showed certain enzymes "more than twice the normal level."  Dr. Nafziger ordered a variety of tests for Mr. Bradshaw, and in April 2007, reviewed those results, finding them to be within normal limits.  Dr. Nafziger then ordered tests for genotyping Mr. Bradshaw.  The genotyping results came back in October 2007, but were inconclusive.  Dr. Nafziger left the employ of the BOP a few months later and thus, ceased further treatment of Mr. Bradshaw.

On these facts, the Court cannot find that Mr. Bradshaw has carried his burden of showing that Dr. Nafziger displayed deliberate indifference to his medical needs.  There is no dispute that Mr. Bradshaw's hepatitis is an objectively serious medical condition, but the record does not support a conclusion that Dr. Nafziger was subjectively indifferent to that condition.  Rather, the record reflects that Dr. Nafziger treated Mr. Bradshaw's hepatitis – or, more accurately, monitored that condition and ordered additional testing with regard to it – repeatedly over the period at issue.  Mr. Bradshaw's belief that Dr. Nafziger engaged in a "ruse" to prevent an earlier biopsy from being approved is nothing more than speculation as to Dr. Nafziger's intent; at best, the evidence that Dr. Nafzinger knowingly recommended a biopsy without ensuring that all of the tests necessary to permit such treatment to occur indicates nothing more than carelessness or oversight, and such negligence is insufficient to demonstrate deliberate indifference.  With regard to the remaining treatment and testing performed by Dr. Nafziger, the

Court has examined those portions of BOP hepatitis treatment guidelines submitted by Mr. Bradshaw and, as best the Court can determine from the limited record, Dr. Nafziger's treatment was not so patently inconsistent with BOP guidelines or recommendations that the Court could conclude that Dr. Nafzinger's subjective state of mind was one of deliberate indifference, rather than carelessness or a difference of opinion.  Under these circumstances, Mr. Bradshaw has not shown that Dr. Nafziger's treatment of his hepatitis reflects deliberate indifference, and Dr. Nafzinger is thus entitled to summary judgment.

Upon Dr. Nafzinger's departure from the BOP, Mr. Osagie became Mr. Bradshaw's primary medical provider for a short period of time.  Mr. Bradshaw admits that Mr. Osagie continued to treat his hepatitis, directing three separate tests to determine Mr. Bradshaw's genotype, although in each case, Mr. Bradshaw's viral load was too low to permit a conclusive genotyping.  Mr. Bradshaw contends that, at this point, Mr. Osagie was obligated under BOP policies to declare him "non-typeable" and begin an aggressive regimen of treatment.[12]

The Court finds that Mr. Bradshaw has failed to demonstrate the subjective element with regard to Mr. Osagie.  The record reflects that Mr. Osagie attempted to continue Mr. Bradshaw's treatment by ordering genotype tests, but that Mr. Bradshaw's viral load was too low to yield meaningful results.  Mr. Bradshaw's contention that BOP guidelines thus required Mr. Osagie to recommend certain treatment is unsupported.  Although Mr. Bradshaw has supplied the Court

---

[12]Mr. Bradshaw also alleges that Mr. Osagie deliberately caused an HIV test report to be sent to him, in order to cause Mr. Bradshaw to speculate as to whether he has HIV.  Mr. Osagie's affidavit states that a different BOP staffer mistakenly ordered an HIV test (apparently instead of an "HCV" test typical for hepatitis patients).  Because Mr. Bradshaw offers nothing more than speculation regarding this event, the Court finds that it fails to demonstrate any deliberate indifference on Mr. Osagie's part.

with the BOP's Guidelines for the Prevention and Treatment of Hepatitis C, the Court notes that

Mr. Bradshaw has not offered opinion testimony by a qualified expert purporting to interpret the

application of these guidelines to Mr. Bradshaw's situation.  It is particularly inappropriate for

this Court, either of its own accord or at Mr. Bradshaw's lay insistence, to attempt to interpret

clinical medical guidelines for treatment.  For example, while Mr. Bradshaw is correct that "Step

8" of the guidelines encourage interferon therapy for inmates with "non-typeable" hepatitis,

neither Mr. Bradshaw nor this Court have the medical expertise necessary to determine under

what circumstances a patient can be properly pronounced to be "non-typeable."  The fact that

Mr. Bradshaw had three inconclusive genotype tests might meet that criteria, or it might not.

Without competent testimony from a medical expert, however, Mr. Bradshaw fails to carry his

burden of demonstrating that Mr. Osagie's treatment of him fell outside the BOP standards,

much less that it amounted to deliberate indifference.  Under these circumstances, the Court

grants summary judgment to Mr. Osagie.

Finally, Mr. Bradshaw asserts claims against Dr. Amirkahn, who performed the

inconclusive genotype tests on Mr. Bradshaw's blood.  He contends that Dr. Amirkahn's tests

were "in violation of proper medical standards."  He argues, without apparent citation, that Dr.

Amirkahn's stated practice of not performing genotype tests on samples with viral loads beneath

a certain threshold is "in violation of proper medical standards."  He contends that Dr. Amirkahn

"had the duty to instruct the lab to attempt genotyping regardless of viral load levels."

This Court has severe doubts that a deliberate indifference claim can ever be asserted

against an outside laboratory that allegedly improperly tested an inmate's blood samples, but

even assuming that such a claim is cognizable, Mr. Bradshaw has offered nothing more than

speculation that Dr. Amirkahn's testimony was inconsistent with standard medical practices. In other words, Mr. Bradshaw has not submitted any competent expert testimony of his own establishing the acceptable testing protocol to be followed in such situations, much less shown that Dr. Amirkahn's actions so grossly deviated from that protocol that one could infer her subjective indifference to Mr. Bradshaw's safety.   Dr. Amirkahn is thus entitled to summary judgment on the claims against her.

### D.  Motion to Amend

On August 30, 3010, the Plaintiffs moved **(# 272)** for leave to file a Second Amended Complaint.  Among the changes that the Plaintiffs sought to make in the Second Amended Complaint are: (i) adding additional allegations on behalf of Mr. Bradshaw regarding "acts and omissions that have occurred in violation of the BOP's hepatitis guidelines since the date of the last Amended Complaint," (ii) naming a different Defendant for an event involving sending information to Mr. Bradshaw about the HIV test; (iii) clarifying the role played by Dr. Amirkahn; (iv) adding a claim under the Little Tucker Act for the BOP's taking funds from the Plaintiffs' accounts under the IFRP without the Plaintiffs' consent; (v) clarifying that the conditions of confinement at ADX give rise to a liberty interest sufficient to justify their due process claims regarding the IFRP; (vi) clarifying various allegations regarding the various ways in which the BOP's actions violated the terms of the IFRP, such as failing to adhere to requirements regarding minimum inmate account balances; and (vii) to assert a claim under the Administrative Procedures Act, seeking review of the BOP's policy providing that IFRP refusal precludes access to the step-down program at ADX, among other things.

The Defendants opposed **(# 279)** the Plaintiffs' request for leave to amend, arguing that

all of the newly-asserted (and existing) claims were futile.

The Court referred the motion to the Magistrate Judge.  However, on September 7, 2010, one week after the motion to amend was filed, this Court granted the Defendants' then-pending motion for summary judgment on the various IFRP claims.  As a result, on November 1, 2010, the Magistrate Judge issued a Recommendation **(# 298)** that the Plaintiffs' motion to amend be denied as "the proposed amended complaint reasserts the claims that have been dismissed."  The Plaintiffs filed timely Objections **(# 303)** to the Recommendation, arguing that this Court had ruled on the summary judgment motions "prior to ruling on the 2d proposed amended complaint" and had erred in not considering the Plaintiffs' tendered declarations, and thus, "the Magistrate was not aware that the District Court's 9/7/10 Order was based on mistake."  The Plaintiffs then summarized several of the arguments that they raised in the Motion for Reconsideration, filed just prior to the Magistrate Judge's Recommendation.

The Magistrate Judge apparently presumed that the Motion to Amend was dispositive in nature, and thus issued a Recommendation regarding it, rather than ruling on it directly.  This Court reviews Recommendations pursuant to Fed. R. Civ. P. 72(b), by considering *de novo* those portions of the Recommendation to which specific objection is made.

Leave to amend a pleading shall be "freely granted" absent a showing of  "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment." *Beerheide v. Zavaras*, 997 F.Supp. 1405, 1409 (D. Colo. 1998), *citing Foman v. Davis*, 371 U.S. 178, 182 (1962).  An amendment can be denied on the grounds of futility if the amended pleading itself would be subject to dismissal. *Jefferson*

*County School Dist. v. Moody's Investor Services, Inc.*, 175 F.3d 848, 859 (10th Cir. 1999);

*Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir.1999).

The Court construes the Magistrate Judge's reasoning – that the proposed amendment

"reasserts the claims that have been dismissed" – to reflect a finding of futility, *i.e.* that the

amended IFRP claims would nevertheless fail to state a cognizable claim.  As the Court noted

above with regard to the Motion for Reconsideration, there is no apparent means by which the

Plaintiffs can state cognizable constitutional claims based on the BOP's withdrawal of privileges

from them due to their IFRP refusal status, and thus, any attempt to replead those claims would

indeed be futile.  (Indeed, the discussion above addresses many of the new legal arguments the

Second Amended Complaint seeks to make with regard to those claims.)  Thus, the granting of

summary judgment on these claims demonstrates that an attempt to reassert or refine them

through additional pleading would be futile.

But reliance on the Court's September 7, 2010 Order is not sufficient to dispose of all of

the potential claims that the Plaintiffs seek to add via amendment.  For example, the Plaintiffs

seek to add new substantive claims under the Little Tucker Act, arising from the BOP allegedly

taking funds from their inmate accounts without authorization, and under the Administrative

Procedures Act, based on the BOP allegedly enacting a policy tying access to ADX's step-down

program to participation in the IFRP.  These claims were not necessarily addressed by the

Court's September 7, 2010 ruling.

With regard to the Little Tucker Act, 28 U.S.C. § 1346(a)(2), the proposed Second

Amended Complaint mentions this Act only in its statement of jurisdiction, explaining that "for

the improper taking of money/property in claims 4, 5, 6, 8, 9, and 10, *Bivens* is appropriate and if

not, in the alternative, . . . the Little Tucker Act allows jurisdiction and is invoked."  The Little

Tucker Act provides that federal courts "shall have original jurisdiction [over] any other civil

action or claim against the United States, not exceeding $ 10,000 in amount, founded either upon

the Constitution, or any Act of Congress, or any regulation of an executive department . . . ."  28

U.S.C. § 1346(a)(2). The Act  "does not provide any substantive rights enforceable against the

United States in a suit for damages; it merely confers jurisdiction whenever such a substantive

right falling within the categories enumerated in the [Act] otherwise exists."  *Brown v. U.S.*, 384

Fed.Appx. 815, 819 (10th Cir. 2010).  Thus, in order to bring a claim under the Little Tucker Act,

the Plaintiffs must first identify an independent basis conferring a substantive right to the relief

requested.

　　　The Plaintiffs appear to contend that this claim is premised upon a contention that

unauthorized deductions from their inmate accounts constitute "takings" in violation of the 5th

Amendment to the Constitution.  The 5th Amendment provides that "private property [shall not]

be taken for public use without just compensation."  The purpose of this amendment is to

"prevent the government for forcing some people alone to bear public burdens which, in all

fairness and justice, should be borne by the public as a whole."  *Pittsburg County Rural Water*

*Dist.  v. City of McAlester*, 358 F.3d 694, 718 (10th Cir. 2004).  This Court need not conduct an

extensive analysis of the Plaintiffs' purported "takings" claim, as it is clear that, to the extent the

BOP took funds from their trust accounts without authorization pursuant to the IFRP, those

funds were admittedly taken in order to satisfy a private restitution obligation that the Plaintiffs

admittedly owe, not for any ostensible "public purpose."  Under these circumstances, a 5th

Amendment "takings" claim will not lie,[13] and allowing assertion of a claim pursuant to the Little Tucker Act would be futile.

The Administrative Procedures Act claim appears to be found at page 8 of the proposed Second Amended Complaint.  It states, that Defendant Lappin has promulgated an "ADX Program Statement Supplement" to the effect that IFRP refusal status "will affect the decision of [an inmate's] suitability for transfer from the ADX."  The Plaintiffs contend that "This provision was not subject to the rigors of the Administrative Procedures Act, 5 U.S.C. § 701, including public notice and comment."  As best the Court can determine, this is the entirety of the Plaintiffs' proposed Administrative Procedures Act claim.  The Administrative Procedures Act ("APA") requires that agencies "follow prescribed notice-and-comment procedures before promulgating substantive rules."  *Sacora v. Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010).  However, these requirements are not applicable to an agency's "interpretive rules, general statements of policy, or rules of agency organization, procedure, and practice."  *Id.*  BOP Program Statements "are internal statements of Bureau of Prison policies that can be altered at will, and, not being adopted through rulemaking procedures . . . do not create entitlements enforceable under the [Administrative Procedures Act]."  *Robinson v. Sherrod*, ___ F.3d ___, 2011 WL 222254 (7th Cir. Jan. 26, 2011).  Thus, to the extent that the Plaintiffs contend that

--------

[13]The Little Tucker Act contemplates "an action or claim . . . founded [upon] any regulation of an executive department."  Certainly, the IFRP is a "regulation of an executive department."  But the IFRP does not purport to create and define any particular claim that may be brought pursuant to it against the United States.  Thus, to the extent that the Plaintiffs wish to bring a claim "founded upon" the IFRP, they must still identify a source of authority creating and describing such a claim.

Defendant Lappin[14] violated the APA by enacting a Program Statement Supplement without first providing for notice and comment, this contention fails to state a claim for relief and allowing amendment of the pleadings to assert it would be futile.

The Court has reviewed the Plaintiffs' remaining proposed amendments and finds that those, too, fail to assert any viable cause of action.  Accordingly, the Court overrules the Plaintiffs' Objections and adopts the Recommendation, denying the Motion to Amend.

### E.  Remaining matters

The preceding discussion is sufficient to dispose of all claims in this case in their entirety. This effectively moots the Plaintiffs' Motion For Certification of Judgments Pursuant to Fed. R. Civ. P. 54(b) **(# 300)**, which is directed at the Court's prior entry of partial judgment on the IFRP claims, Mr. Bradshaw's Motion for Leave to File Affidavit and Medical Records **(# 306)** relating to a fellow inmate who is not a party to this case and whose medical situation is irrelevant to the issues here.  Mr. Bradshaw's Motion to File Supplemental Records **(# 312)** further supporting his summary judgment response tenders documents that either (i) relate to treatment by a Dr. Allred, who is neither named as a Defendant in the current Amended Complaint **(# 129-1)**, nor named as a putative Defendant in Mr. Bradshaw's proposed Second Amended Complaint **(# 272-1)**, or (ii) fail to alter the analysis above.  Accordingly, that motion is denied.

The only motion that remains of significance is Mr. Bradshaw's Motion to Correct Dual Filing Fee Fundamental Unfairness **(# 293)**.  There, Mr. Bradshaw points out that, after filing an appeal of the *sua sponte* dismissal of this action, he commenced a second suit in an abundance of

---

[14]The Court notes that its September 7, 2010 Order dismissed all claims against Defendant Lappin on the grounds that the Court lacked personal jurisdiction over him.  This, too, warrants denial of the Motion to Amend to assert the APA claim.

caution to preserve the timeliness of his medical treatment claims.  This Court later consolidated

that second suit with this suit, and Mr. Bradshaw requests that the Court enter an order deeming

payments he made towards the filing fee in that case to count against his filing fee in this action.

He explains that, but for the Court's improper *sua sponte* dismissal of this action, he would not

have had to file the second action and would not have incurred the additional filing fee.

Although the Court is sympathetic to Mr. Bradshaw's situation, it finds no authority to,

effectively, waive the filing fee for his second action.  As with all litigants, Mr. Bradshaw's

decision to commence a second action as a strategic choice – in this case, to preserve his medical

claims if his appeal proved unsuccessful.  As with all strategic decisions, the decision to

commence a second suit entails both costs and benefits, and this Court sees no basis to,

retrospectively, insulate Mr. Bradshaw from the costs of that strategic choice.  In any event, the

Court notes that pursuant to 28 U.S.C. § 1915(b), a prisoner bringing any civil action (including

a prophylactic second action) "shall be required to pay the full amount of a filing fee."  The

Court construes the mandatory language – "shall" – to prevent it from effectively waiving the

filing fee for Mr. Bradshaw's second suit.   Thus, Mr. Bradshaw's motion to be relieved of his

filing fee obligations with regard to the second suit (or, depending on how his payments to date

are credited, any remaining filing fees owing on this suit) is denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment **(# 250)** is

**DENIED AS MOOT**.  Defendants' Second Motion for Summary Judgment **(# 282)** is

**GRANTED**, and the Clerk of the Court shall enter judgment in favor of Defendants Nafziger,

Osagie, and Amirkahn on all claims in this action.  Mr. Bradshaw's Motion to Correct Dual

Filing Fee Fundamental Unfairness (**# 293**) is **DENIED**.  The Plaintiffs' Motion for

Reconsideration (**# 295**) of the Court's September 7, 2010 Opinion (**# 280**) is **GRANTED IN**

**PART**, insofar as the Court has reconsidered its prior decision in light of the arguments raised in

the motion, but **DENIED IN PART**, insofar as, upon reconsideration, the Court finds that its

previous rulings were sound.  Mr. Bradshaw and former Plaintiff Mr. Tuttamore's Motion For

Certification of Judgments Pursuant to Fed. R. Civ. P. 54(b) (**# 300**) is **DENIED AS MOOT**.

The Plaintiffs' Objections (**# 303**) to the November 1, 2010 Recommendation (**# 298**) of the

Magistrate Judge are **OVERRULED**, the Court **ADOPTS** that Recommendation, and the

Plaintiffs' Motion to Amend the Complaint (**# 272**) is **DENIED**.  Mr. Bradshaw's Motion for

Leave to File Affidavit and Medical Records (**# 306**) is and Mr. Bradshaw's Motion to File

Supplemental Records (**# 312**) are **DENIED AS MOOT**.  The Court having dismissed all of the

claims against or entered judgment in favor of all of the Defendants in this case, the Clerk of the

Court shall close this case.

   Dated this 10th day of March, 2011

                                    **BY THE COURT:**

                                    _____

                                    Marcia S. Krieger
                                    United States District Judge